# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| CONSUELO E. KELLY-LEPPERT,<br>Individually, and as surviving spouse,<br>and heir at law of MICHAEL JOSEPH<br>KELLY, deceased<br><br>      Plaintiff,<br><br>v.<br><br>MONSANTO COMPANY, a Delaware<br>Corporation,<br><br>      Defendant, | )<br>)<br>) Civil Action No. 20-2121-KHV-TJJ<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

COMES NOW, Plaintiff Consuelo E. Kelly-Leppert, by and through undersigned counsel and pursuant to D. Kan. Rule 15.1(a), amends, as a matter of course, her first complaint for damages against Defendant Monsanto Company ("Monsanto"), and provides the following allegations:

### *Introduction*

1. Plaintiff Consuelo E. Kelly-Leppert, following the court's approval of her motion for leave, hereby files this First Amended Complaint.

2. This case is brought by Plaintiff Consuelo E. Kelly-Leppert, individually, and as the surviving spouse and legal heir of Michael Joseph Kelly, now deceased. Plaintiff brings this action against Defendant Monsanto Company (hereinafter "Defendant" or "Monsanto") for wrongful death which occurred as a result of Michael Joseph Kelly's exposure to Roundup® glyphosate-based herbicides.

3.     Plaintiff first filed her case against Monsanto in the United States District Court for the District of Kansas.

4.     At the time she filed her first Complaint Plaintiff resided in the city of Overland Park, located in Johnson County, Kansas.

5.     Plaintiff currently resides in Overland Park, Johnson County, Kansas.

6.     At the time of first filing Defendant Monsanto Company is a multinational agricultural biotechnology corporation incorporated under the laws of the state of Delaware and with its principal place of business in St. Louis, Missouri.

7.     Plaintiff, Consuelo Leppert-Kelly resided in Overland Park, Johnson County, Kansas when Michael Joseph Kelly died of carcinoma of the lung on or about October of 2011.

8.     Jurisdiction is proper based on diversity under 28 U.S.C. § 1332 because Plaintiff is a citizen of Kansas, a different state than the Defendant's state of citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

### *General Allegations*

9.     In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

2

10.     "Roundup®" refers to all formulations of Defendant's Roundup® products.

11.     Defendant Monsanto designed, developed, manufactured, produced, sold, distributed, promoted, marketed, and supplied an herbicide known as Roundup®.

12.     Defendant Monsanto is or should be aware Roundup® may cause cancer in humans. At the very minimum, Defendant is aware Roundup® contains chemicals that are hazardous to humans and has issued Safety Data Sheet ("SDS") [1] for each formulation of Roundup®, providing detailed information on the Products' hazards, routes of human exposure, and precautions for safe handling.

13.     Roundup® is hazardous according to the OSHA Hazard Communication Standard. 29 CFR 1910.1200 [2], which include "eye contact, [s]kin contact, [and] inhalation." *Id*. The SDS suggests users "[w]ear protective eye/face protection," specifically, "chemical goggles" and "chemical resistant gloves." *Id*.

14.     Conversely, the Roundup® consumer label provides "Keep Out of Reach of Children" and "Caution," with the only hazard identified being "moderate eye irritation," thus completely lacking any routes of human exposure or suggested eye protection.

15.     The SDS further cautions of the danger posed by spray drift, which occurs when Roundup® products with a "spray applicator", "trigger sprayer", or "sprayer", seep particles into the wind before reaching the intended target; this "mist" results in a heightened risk to consumers of inhalation.

16.     Roundup® contains and has contained component ingredients including, but not limited to, glyphosate, which alone, in combination with other Roundup® component

ingredients and/or in combination with other substances are genotoxic and carcinogenic. Roundup® is genotoxic and carcinogenic.

17.    On March 20, 2015, the International Agency for Research on Cancer ("IARC") an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate.

18.    The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans.[3]

19.    The IARC also found that glyphosate caused DNA and chromosomal damage in human cells. *Id*.

20.    The IARC also noted, glyphosate induced DNA oxidative stress, and chromosomal damage in mammals and in human and animal cells in utero.

21.    The IARC's conclusions were consistent with scientific developments that had occurred in prior decades.

22.    On March 4, 1985, researchers within the Environmental Protection Agency's Toxicology Branch published a memorandum, which "classified Glyphosate as a Category C oncogene," meaning glyphosate is a possible human carcinogen.

23.    In 1985, the EPA modified the classification of glyphosate to 'Group E', this report emphasized this classification was not to be "interpreted as a definitive conclusion that the

24.    Since 2015, ten governmental bodies have issued laws restricting the use of Roundup® and glyphosate-based herbicides.

25.     At all times relevant hereto, Defendant Monsanto knew or in the of reasonable care should have known that Roundup® and its component ingredients were genotoxic, carcinogenic, hazardous to human health and otherwise posed an unreasonable risk of harm to the health of persons coming into contact with the same.

### General Allegations Concerning Michael Joseph Kelly's
### Exposure to Roundup® and Glyphosate

26.     Plaintiff alleges that Michael Joseph Kelly died from injuries sustained as a result of his exposure to Defendant's Roundup® products, including but not limited to Roundup® Grass and Weed Killer sold under several marketing names by Monsanto from about 1974 until 2018, Michael Joseph Kelly used various Roundup® products including those with a hand sprayer and tow tank on his residential property.

27.     Michael Joseph Kelly was exposed to Monsanto's Roundup® products from in or around July 1974 through 2018. During this time, Michael Joseph Kelly used Monsanto's Roundup® products on average two times a month.

28.     Plaintiff used Monsanto's Roundup® products at his residence in Overland Park, Johnson County, Kansas.

29.     Michael Joseph Kelly passed away on or about October of 2011 with the cause of death being "carcinoma of lung."

### Defendant Monsanto Company's Concealment of risks posed by
### Roundup® tolls any applicable statutes of limitation

30.     The existence of Roundup®'s carcinogenic properties and/or its potential to cause cancer was not factually established until August 10, 2018, when the jury in *Johnson v. Monsanto Co.* found Roundup® was a substantial cause of cancer and Defendant

Monsanto Company failed to adequately warn customers of the risks associated with its Roundup® glyphosate based products.

31.     Plaintiff Consuelo E. Kelly-Leppert filed her *pro se* Complaint on March 16, 2020.

32.     Defendant Monsanto possessed specific and superior knowledge concerning the above hazardous properties of Roundup®.

33.     Plaintiff, and Michael Joseph Kelly, did not know and had no reasonable way to know or realize the risks associated with Roundup®. Defendant Monsanto should have anticipated that individuals like Michael Joseph Kelly and plaintiff did not know and would not discover or realize said risks.

34.     At all times relevant hereto, Defendant Monsanto had feasible means by which to convey warnings, hazard communications and other necessary health-related information to those using and/or working with and/or around Roundup®.

35.     By reason of the foregoing, the claims of Plaintiff for the death of Michael Joseph Kelly are timely under any applicable statutes of limitation pursuant to the discovery rule and the doctrine of fraudulent concealment.

### *Registration of Herbicides under Federal Law*

36.     Chemicals like Roundup® are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"). 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the EPA prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. § 136(a).

37.     The EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe", but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

38.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

39.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States and the state of Kansas.

40.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup® conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The Government is not required nor is it able, however, to perform the product tests that are required of the manufacturer.

41.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

42.     In the case of glyphosate, and therefore Roundup® the EPA had planned on releasing its preliminary risk assessment—in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but its delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

43.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[4]

44.     On September 12, 2016, the EPA's office of Pesticide Programs released and interim report, titled "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," ("2016 Issue Paper") detailing the agency's review of a small portion of the existing literature on Roundup®. The 2016 Issue Paper contains a review of studies submitted to the agency by Monsanto, as well as general independent scientific literature on glyphosate carcinogenicity.

45.     Immediately following the publication of the 2016 Issue Paper, the FIFRA Scientific Advisory Panel ("SAP") issued a report which reviewed the EPA's 2016 Issue Paper, and the conclusions therein. The SAP strongly criticized the EPA's conclusions and questioned the scientific approach of the agency, noting that the agency had failed to follow its own guidelines.

<u>**Count I**</u>
***Negligence of Defendant Monsanto***

46.     Plaintiff hereby incorporates by reference all allegations contained in paragraphs   1-53.

47.     Defendant Monsanto issued and provided specifications, instructions, and directions to users of Roundup® regarding the application, use and employment of Roundup®. Defendant Monsanto intended and/or foresaw that Michael Joseph Kelly would use and rely upon said specifications, instructions and directions.

48.     At all times relevant hereto, the Roundup® supplied to Michael Joseph Kelly was applied, employed, and used in the intended manner and for the intended purposes pursuant to said specifications, instructions, and directions. Defendant Monsanto knew

and/or should have known the manner in which, and purpose for which, Michael Joseph Kelly applied, employed, and used Roundup® that it had supplied.

49.     Defendant Monsanto knew or should have known that said application, use and employment of Roundup® would cause Michael Joseph Kelly and other similarly situated, to be exposed to Roundup® and its component ingredients both during and after it was sprayed onto grass, and other plants. It was specifically foreseeable to Defendant Monsanto that in fulfilling the intended purpose of its product users would be frequently exposed to the carcinogenic components of Roundup®.

50.     At all times herein relevant, Defendant Monsanto had a duty to exercise reasonable and ordinary care for the health, safety, and well-being of Michael Joseph Kelly, Plaintiff, and other similarly situated who were working with and around Roundup® including, but not limited to, a duty to warn—communicate foreseeable hazards arising in connection with any and all known and/or intended uses of the same.

51.     Defendant Monsanto breached said duties and was negligent in one or more of the following respects:

        a.      Designed, developed, manufactured, produced and promoted a genotoxic, carcinogenic product—namely Roundup®--and supplied the same to Michael Joseph Kelly, and others;

        b.      Designed, developed, manufactured, produced and promoted a genotoxic, carcinogenic product—namely Roundup®--and supplied the same to Michael Joseph Kelly;

c.      Engaged in the aforesaid activities when adequate alternate less hazardous formulations were available, possible and/or could have been developed;

d.      Specified, recommended, promoted, encouraged and/or otherwise facilitated the utilization of Roundup®;

e.      Provided instructions and direction to users such as Michael Joseph Kelly in general regarding the use and application of Roundup® without including any or adequate warnings/hazard communications and/or instructions as to working with and/or around Roundup®;

f.      Otherwise failed to provide any or adequate warnings/hazard communications to persons working with and around Roundup® including Michael Joseph Kelly and others similarly situated;

g.      Failed to provide adequate warnings/hazard communications and/or instructions regarding hazards that would foreseeably be encountered in the course of known and/or intended uses and applications of Roundup by Michael Joseph Kelly and others similarly situated;

h.      Failed to conduct adequate tests to determine the hazards to which those working with and around Roundup® would be exposed and the nature and extent of such hazard; and/or,

i.      Failed to disclose known and knowable information concerning the risks and hazards associated with Roundup®.

52.     As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions on the part of Defendant Monsanto, Michael Joseph Kelly was

exposed to Roundup® and its component ingredients as described, causing him to develop the aforesaid carcinoma and ultimately pass away.

WHEREFORE, Plaintiff Consuelo Kelly-Leppert on behalf of Michael Joseph Kelly now deceased, prays judgment be entered against Defendant Monsanto Company for compensatory damages and for costs, pre-judgment interest, post-judgment interest and such other and further relief as this Court deems appropriate.

## Count II
### *Strict Liability (Design Defect)*

53.     Plaintiff incorporates by reference the paragraphs 1-53 of this Complaint.

54.     The Roundup® supplied by Defendant Monsanto to Michael Joseph Kelly and other similarly situated was in a defective and unreasonably dangerous condition at the time it left the control of Defendant Monsanto: (a) it contained and incorporated hazardous, genotoxic and carcinogenic substances to which individuals would be exposed; (b) it was designed and intended to be used in  a manner such that the regular, expected and intended use of Roundup® would foreseeably cause exposure to hazardous, genotoxic and carcinogenic substances; (c) it was not accompanied by any warnings or instructions regarding the hazards associates with the regular, expected and intended use of Roundup® and/or any such warning or instructions were not adequate.

55.     Said Roundup® reached Michael Joseph Kelly in substantially the same condition as when it left the control of the Defendant Monsanto. At all relevant times, said Roundup® was used in the manners and environments anticipated, expected and intended by Defendant Monsanto and which were reasonably foreseeable to Defendant.

56.    Therefore, at all times relevant to this litigation, Defendant's Roundup® products as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant were defective in design and formulation in one or more of the following ways:

a.    When placed in the stream of commerce, Defendant's Roundup® products were defective in design, formulation, and, consequently dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.    When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.    When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.    Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e.    Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f.    Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries,

13

g.      Defendant did not conduct adequate post-marketing surveillance of its Roundup® products; and/or

h.      Defendant could have employed safer alternative designs and formulations.

57.     As a direct and proximate result of one or more of the foregoing unreasonably dangerous and defective conditions of Roundup®, Michael Joseph Kelly was exposed to Roundup® and its component ingredients as described, causing him to develop the aforesaid carcinoma, and thereby sustain damages as outlined above.

58.     At the time Roundup® products left Defendant's control, there was practical technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of defendant's herbicides.

59.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

60.     The defects in Defendant's Roundup® products were substantial and contributing factors in causing the death of Michael Joseph Kelly, and but-for Defendant's misconduct and omissions, Plaintiff would not have sustained her injuries.

61.     As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries.

WHEREFORE, Plaintiff Consuelo Kelly-Leppert prays judgment be entered against Defendant Monsanto Company for compensatory damages and for costs, pre-

judgment interest, post-judgment interest, and such other and further relief as this Court deems appropriate.

## COUNT III
### *Strict Liability (Failure to Warn)*

62.     Plaintiff incorporates by reference each and every allegation in paragraphs 1-53 fully herein.

63.      At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Michael Joseph Kelly and those similarly situated, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

64.     Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Michael Joseph Kelly, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

65.     At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that

its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn users such as Michael Joseph Kelly of the dangerous associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

66.     At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

67.     At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

68.     At al times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Michael Joseph Kelly.

### Count IV
#### *Loss of Consortium (Negligence)*

69.     Plaintiff incorporates by reference paragraphs 1-53 of this Complaint.

70.     As a direct and proximate result of the negligent acts and omissions of Defendant Monsanto, which caused Plaintiff's spouse to contract carcinoma and suffer the associated impairments and disabilities, and ultimately death, Plaintiff has and will

continue to suffer a loss of support, consortium, and society of said spouse, together with related emotional suffering.

WHEREFORE, Plaintiff Consuelo Kelly-Leppert prays judgment be entered against Defendant Monsanto Company for compensatory damages and for costs, pre-judgment interest, post-judgment interest, and such other and further relief as this Court deems appropriate.

### COUNT V
### *Breach of Express Warranties*

71.     Plaintiff incorporates by reference each and every allegation set forth in paragraphs 1-53 as if fully stated herein.

72.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Michael Joseph Kelly, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control of Defendant.

73.     Defendant had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, promotion, sale, and release of its Roundup® products, including a duty to:

a.      warn of dangerous and potentially fatal side effects; and

b.      disclose adverse material facts, such as the true risks associated with the use of an exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Michael Joseph Kelly.

74.     At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its products, by and through statements made by Defendants

17

in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

75.     These express representations include incomplete warnings and instructions that purport but fail to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate, a proven carcinogen. Defendant knew or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup® products were safe and effective, that they were safe and effective for use by individuals such as Michael Joseph Kelly, and/or that they were safe and effective as a consumer agricultural herbicide.

76.     The representations about Roundup® as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

77.     Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

78.   Defendant breached these warranties because, among other things, its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the warranties in the following ways:

a.   Defendant represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b.   Defendant represented that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup® had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternatives available on the market.

79.   Upon information and belief, at all times relevant, Michael Joseph Kelly was in privity with Defendant

80.   On information and belief, Michael Joseph Kelly as well as Plaintiff justifiably and detrimentally relied on the express warranties and representations of Defendant in the purchase and use of its Roundup® products. When Michael Joseph Kelly purchased Roundup® he reasonably relied upon Defendant to disclose known defects, risks, dangers, and side effects of Roundup® and glyphosate.

81.     Michael Joseph Kelly and Plaintiff had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®.

82.     Michael Joseph Kelly used and/or was exposed to the use of Roundup® as researched, developed, designed, tested, manufactured, labeled, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

83.     Had the warnings and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Michael Joseph Kelly's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Michael Joseph Kelly could have avoided the injuries which he suffered.

84.     As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses, and will continue to incur these damages into the future.

WHEREFORE, Plaintiff Consuelo Kelly-Leppert requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages with interest, costs incurred herein, attorney's fees, and all such other and further relief as this Court deems just and proper.

## Count VI

### *Breach of Implied Warranties*

85.     Plaintiff hereby incorporates the allegations contained in paragraphs 1-53.

86.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

87.     Before the time that Plaintiff used and/or was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to consumers— including Plaintiff's employer—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

88.     Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use and/or expose to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

89.     Upon information and belief, Plaintiff's employers reasonably relied upon the skill, superior knowledge, and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

90.     Upon information and belief, Michael Joseph Kelly was at all relevant times in privity with Defendant through the purchase and use of Roundup®.

91.     Plaintiff and Michael Joseph Kelly were the intended third-party beneficiaries of implied warranties made by Defendant to the purchasers of its horticultural herbicides.

92.     The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

93.     At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Michael Joseph Kelly, would use Roundup® products as marketed by Defendant, which is to say that Michael Joseph Kelly was a foreseeable user of Roundup®.

94.     Defendant intended that Roundup® products be used in the manner in which Michael Joseph Kelly used them and Defendant's impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

95.     In reliance upon Defendant's implied warranty, Michael Joseph Kelly used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendant.

96.     Defendant breached its implied warranty to Plaintiff in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately

tested. Roundup® has dangerous propensities when used as intended and can cause injuries, including those injuries complained of herein.

97.     The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

98.     As a direct and proximate result of Defendant's wrongful acts and omissions Michael Joseph Kelly has suffered severe permanent physical injuries and death. Plaintiff has suffered severe emotional injuries, has endured pain and suffering, and has suffered economic loss (including significant expenses for the medical care and treatment of Michael Joseph Kelly).

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## Count VII
### *Fraud*

99.     Plaintiff reincorporates the allegations contained in paragraphs 1-53 as if fully stated herein.

100.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

101.    In the first instance Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide

toxicology studies relating to Roundup®.[5] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

102.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® based herbicide to be invalid.[6] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[7]

103.    Three top executives of IBT were convicted of fraud in 1983.

104.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[8]

105.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

106.    Defendant made misrepresentations and/or material omissions in its statements on Roundup® labeling, and in the promotion and marketing of Roundup®, including through the internet, television, print advertisements, etc. Nothing prevented Defendant from disclosing the truth about the risks posed with Roundup®.

107.    Defendant made such misrepresentations and material omissions with the intent of defrauding and deceiving the public in general, with the intent of inducing the public to purchase and use Roundup®.

108.    Defendant Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward consumes like Michael Joseph Kelly and the public generally.

109.    Defendant Monsanto's conduct in deceiving was willful, wanton, and/or reckless. Defendant deliberately made statements on the labeling and promotionally which failed to disclose the true risks of Roundup®, and by reason thereof, Defendant is liable for reckless, willful, and wanton acts wand omissions which evidence a total and conscious disregard for the safety of Michael Joseph Kelly and others like him.

110.    As a direct and proximate result of the conduct of defendant, Michael Joseph Kelly suffered physical and emotional injury, and ultimately death; further, Plaintiff Consuelo Kelly-Leppert has suffered emotional injury, loss of consortium, and financial expense, which she will continue to suffer.

WHEREFORE, Plaintiff Consuelo Kelly-Leppert requests this Court to enter judgment in her favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all such other and further relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Consuelo Kelly-Leppert, for and on behalf of Michael Joseph Kelly now deceased, prays for judgment and relief on all causes of action as follows:

A.     For Plaintiff Consuelo Kelly-Leppert's past and future general damages in an amount in excess of the jurisdictional minimum, according to proof;

B.     For Plaintiff Consuelo Kelly-Leppert's past and future economic damages, including medical expenditures incurred in the treatment of Michael Joseph Kelly;

C.     For Michael Joseph Kelly's past lost earnings, lost earnings capacity;

D.     For Plaintiff Consuelo Kelly-Leppert's loss of consortium, loss of financial support, and other economic losses in an amount in excess of the jurisdictional minimum, according to proof;

E.     For exemplary and punitive damages sufficient to punish and deter Defendant Monsanto and others from future fraudulent practices;

F.     Pre-judgment interest from the date of filing this suit;

G.     For all statutorily allowed damages;

H.     For awarding Plaintiff reasonable attorney's fees and other costs of these proceedings; and

I.     Such other and further relief as the Court may deem necessary and appropriate.

## JURY DEMAND

Plaintiff hereby requests a trial by jury as to all issues so triable.

Dated: December 11, 2020                     Respectfully Submitted,

**KANSAS CITY INJURY LAW GROUP**

/s/ Andrew B. Protzman
Andrew B. Protzman, KS Bar No. 18015
Kansas City Injury Law Group

26

1100 Main Street, Suite 2430
Kansas City, MO 64105
(816) 499-8877 (phone)
(816) 737-8677 (fax)
 andy@kcilg.com

Brandon D. Kerns, Mo. Bar No. 72878
Kansas City Injury Law Group
1100 Main Street, Suite 2120
Kansas City, MO 64105
(816) 499-8877 (phone)
(816) 737-8677 (fax)
brandon@kcilg.com
*APPEARING PRO HAC VICE*

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2020, I electronically filed the forgoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Patrick Fanning
Bar Number 19015
PEAK Litigation
4900 Main Street, Ste. 160
Kansas City, Mo 64112
Telephone: (816) 281-5405
Email: pfanning@peaklitigation.com
***Attorney for Defendant***

/s/ Andrew Protzman          
**Attorney for Plaintiff**

27

---

[1] The Occupational Safety and Health Administration's ("OSHA") Hazard Communication Standard (29 CFR 1910.1200(g)), revised in 2012, requires the chemical manufacturer, distributor or importer to provide Safety Data Sheets (SDSs) (formerly MDSs or Material Safety Data Sheets) for each hazardous chemical to downstream users to communicate information on these hazards. SDSs are provided to distributors of the product but not directly to consumers.

[2] *Safety Data Sheet, Roundup*® Ready-To-Use Weed & Grass Killer III, EPA Reg. No. 71995-33 (May 13, 2015).

[3] Guyton, et al. *Carcinogenicity of Guyton, et al. Carcinogenicity of tetrachlorvinphos, parathion, malathion, diazinon and glyphosate, 112 IARC Monographs, 76, section 5.4 (2015), available at http://dx.doi.org/10.1016/S1470-2045(15)70134-8*.

[4] U.S. Environmental Protection Agency, Memorandum, Subject: SECOND Peer Review of Glyphosate,1, (1991), available at: http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

[5] *Backgrounder. Testing Fraud: IBT and Craven Laboratories*, Monsanto, (Sept. 2, 2015), available at http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

[6] U.S. EPA, Summary of the IBT Review Program Office of Pesticide Programs, (1983), available at http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&@&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p@f&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%tspage&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL

[7] Robin, Marie-Monique. *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011). *Citing* U.S. EPA. *Data validation. Memo from K. Locke, Toxicology Branch,to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978).

[8] *Backgrounder. Testing Fraud: IBT and Craven Laboratories*, Monsanto, *supra*.